Filed 6/30/22  P. v. Rodriguez CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>ABEL RODRIGUEZ, JR.,<br><br>        Defendant and Appellant. | F080915<br><br>(Super. Ct. No. 1404791)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy A. Leo, Judge.

Martin Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Sally Espinoza and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Abel Rodriguez, Jr., and his cousin, Pedro Alvarez, were charged with one murder and two attempted murders in connection with a drive-by shooting committed in Modesto in 2009.  In 2019, Alvarez testified for the prosecution in exchange for a plea offer of voluntary manslaughter with a gang enhancement.  (Pen. Code, §§ 192, subd. (a), 186.22, subd. (b)(1)(C).)[1]

The jury convicted defendant on count I of the murder of Guillermo Gomez, with findings that the murder was premeditated and committed by discharge of a firearm from a motor vehicle.  (§§ 187, subd. (a), 189, subd. (a).)  On counts II and III, the jury convicted defendant of the premeditated attempted murders of Gabriel N. and Luis C. (§§ 664/187, subd. (a), 189, subd. (a).)  On all three counts, the jury found the firearm enhancement and the gang enhancement allegations true.  (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b)(1).)  In a bifurcated proceeding, defendant admitted suffering two prior serious felony convictions for the purpose of Three Strikes[2] law sentencing and imposition of a prior serious felony conviction enhancement under section 667, subdivision (a)(1).  On the prosecutor's motion, one of the prior convictions was stricken in the interest of justice.  (§ 1385.)[3]

Defendant was sentenced to an aggregate term of 15 years plus 153 years to life, as follows.  The trial court imposed a term of 25 years to life on count I, doubled to 50 years to life under the Three Strikes law, plus an additional 25 years to life for the firearm enhancement; and to terms of seven years to life on count II and count III,

---

[1]    All further references are to the Penal Code unless otherwise specified.

[2]    Sections 667, subdivisions (b)–(i), 1170.12, subdivisions (a)–(d).

[3]    Section 1385 was amended effective January 1, 2022, by Senate Bill No. 81 (2021–2022 Reg. Sess.) Statutes 2021, chapter 721, section 1.  As discussed herein, the jury's gang enhancement findings must be vacated and the matter remanded for further proceedings.  When defendant is resentenced, section 1385 as amended will apply.  (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

doubled to 14 years to life, plus additional terms of 25 years to life for the firearm enhancement. On all counts, the court imposed a 10-year gang enhancement, stayed, and a five-year prior serious felony conviction enhancement.

Defendant advances three claims on appeal. He argues that the trial court erred under Evidence Code section 352 when it admitted evidence of his two prior assault convictions as predicate offenses within the meaning of section 186.22, former subdivision (e). He also argues that his convictions for attempted murder are not supported by substantial evidence of intent to kill, and, via supplemental briefing, that he is entitled to reversal of the gang enhancements under Assembly Bill No. 333,[4] which amended section 186.22, effective January 1, 2022.

The People concede that defendant is entitled to have the gang enhancement findings vacated given the amendments to section 186.22. However, they dispute entitlement to relief on his other two claims.

We find no abuse of discretion in the admission of defendant's two prior assault convictions as predicate offenses under the gang statute, and we find the jury's attempted murder verdicts supported by substantial evidence. However, we agree with the parties regarding defendant's entitlement to relief under Assembly Bill 333. We shall vacate the gang enhancement findings and remand the matter for further proceedings. The judgment is otherwise affirmed.

---

[4] Assembly Bill No. 333 (2021–2022 Reg. Sess.) Statutes 2021, chapter 699 (Assembly Bill 333 or Assem. Bill 333).

**FACTUAL SUMMARY**

## I.      Prosecution Case

### A.      Shooting

On July 4, 2009, Gabriel, then 16 years old, was in the front yard of his house with his 13-year-old brother, Jose S. Their family was having a barbecue that day to celebrate the holiday and his stepfather had a number of friends over, drinking and listening to music. Just before 10:00 p.m., a car pulled up across the street from the house, there was a burst of gunfire, and the car took off.

Gabriel's mother, who was inside the house when the shooting occurred, called 911. An unidentified child's voice stated the car was a red Charger, but Jose told the 911 operator it was a black, four-door Dodge Charger with tinted windows and the gun was an uzi.

Gabriel and Luis were transported to the hospital with gunshot wounds, and police found Gomez's body in the street with multiple gunshot wounds. They also located 12 nine-millimeter shell casings in the street in close proximity to one another, consistent with witness reports and trial testimony that the car either stopped or drove by slowly.

Deputy Mendonza was responding to the scene when he saw a black Charger with shiny rims heading toward the freeway. Authorities were on the lookout for several vehicles, including a black Charger, so he turned around and followed the Charger with his lights and siren activated. The driver yielded to him after crossing an intersection, but when he turned on his spotlight to determine whether he had the correct vehicle, the driver pulled back into traffic and sped off.

The Charger was faster than Mendonza's patrol car, but he obtained the license plate number and was able to keep the Charger's taillights in view during the pursuit. At times, the Charger's speed exceeded 125 miles per hour. The pursuit proceeded southbound on Highway 99 until the driver exited the highway in Turlock. In the process of turning left after taking the offramp, the driver lost control of the Charger and it

4.

skidded across the intersection, went over a curb, and landed up an embankment. Additional law enforcement vehicles arrived within seconds.

There were only two individuals in the Charger, defendant, who was driving, and Alvarez. They exited the vehicle without incident. Defendant had a red shirt on, and Alvarez was wearing a red belt with the letter "N" on it for "norte," and he had a red and black baseball hat that was found in the car. Mendonza saw one shell casing, later identified as a nine-millimeter, inside the car on the driver's side floorboard. There was a huelga bird hanging from the rearview mirror, and a red handkerchief attached to the center console.

Mendonza did not see anything tossed out of the Charger during the pursuit, but officers searched along the route the next day. Deputy Redding located a Glock pistol with an empty magazine on the west side of the freeway in the area of the Tuolumne River bridge. The gun was clean, without any dirt or rust, and it had an aftermarket attachment that allowed the user to switch the gun from semiautomatic to automatic with a button, consistent with the machine gun-like firing described by witnesses. The firearm and ballistics expert testified that he had no doubt that the 12 casings at the scene and the one casing inside the Charger were all fired from the recovered Glock.

Gunshot reside was detected on defendant's and Alvarez's hands. However, the DNA collected from the gun was not of sufficient quantity to allow for interpretation.

### B.    Eyewitness Testimony

At trial, Gabriel, Jose, and their mother denied any gang involvement. Gabriel saw a dark car pull up slowly with its lights off. The windows were rolled down and something that looked like a gun came up from the driver's window, which was facing the house. It was dark out and the car windows were tinted, so Gabriel did not see the shooter or how many people were in the car. He heard three popping noises and saw flashes. He fell to his knees and realized he had been shot when he tried to get up and

felt pain in his chest. He also saw one other person, who had been hanging out with his stepfather but whom he did not know, rolling around and holding his chest.

Gabriel was not sure about the color of the car and recalled it was perhaps burgundy. On cross-examination, he testified he only remembered the car being dark, but when asked whether he remembered telling officers it was a nice burgundy car, he said "I think so, sounds pretty on it."

Jose testified that he and Gabriel were leaning against his stepfather's car in the driveway, facing the street, when a black Dodge Charger rolled up slowly, which Jose thought was "weird." Jose was approximately 16 feet away from the car. The rear windows were rolled up and he could not see how many people were in the car. He heard rapid shots like from an uzi, or a machine gun, and saw flashes coming from the driver's window. The car then left, and Gabriel told Jose he had been shot.

After the shooting, police took Jose to see the Charger defendant was driving at the location where it was wrecked. Jose told them it was not the car involved in the shooting. He testified the rims were different.

A third eyewitness, Primitivo G., also testified. He was in custody and serving a 20-year sentence for second degree murder committed in 2010. He denied he was a Sureño at the time of trial or that he was gang affiliated in 2009, but he had friends who were Sureños. He said he could not remember much about what happened 10 years ago and denied fearing a snitch label.

Primitivo testified that the only person he knew at the barbecue was "Fat Boy," whom he only knew by his moniker. Primitivo recalled seeing a black car and hearing shots. "Fat Boy" and someone whose mother was tending to him were shot, and Primitivo stumbled over the body of a third person in the street. He had never seen the third person before, but described him as a "Paisano" or "regular Mexican."

### C.    Alvarez's Testimony

Alvarez testified that defendant was the shooter.  The two of them were hanging out that day, and defendant drove them to a friend's house in his girlfriend's black Charger.  The friend was not at home, but there was a small group gathered in the front yard of the house, and defendant and Alvarez stayed for a while.  They had been there about an hour when a white car drove up and the occupants told the group there were some "scraps," a derogatory reference to Sureños, "[a]round the corner on Figaro."

Alvarez was bored and around 20 minutes later, he told defendant they should go. After defendant started the car, he pulled a fully automatic Glock from his waistband, which Alvarez had seen him with multiple times, and put it in his lap.  As defendant turned onto Figaro, he said, "'Let's see what these fools are talking about,'" and chambered a bullet in the gun.  They saw a group having a barbecue in front of a house. Defendant stopped the car in front of the house, put both hands out his window, emptied the gun, and took off.

They heard sirens almost immediately and when they passed through a nearby intersection, an officer pulled behind them.  Defendant yielded to the officer, but then took off when it looked like the officer was trying to box their car in.  During the pursuit, defendant handed Alvarez the gun and told him to throw it out the window, which he did. The pursuit ended when defendant lost control of the car in Tulare and wrecked it.

Alvarez testified he was gang involved between the ages of 13 to 26 years old, approximately, but he dropped out in 2015 while in custody, after some "kites," or "wilas," he was supposed to be safekeeping were confiscated from his cell.  At the time of the shooting in 2009, he said he was an active Norteño and defendant was a member of the West Side Boyz.  However, Alvarez also described himself as a Northerner who became a Norteño in jail, and stated he sold drugs and watched cells for the gang.  When things did not work out, he became a Northerner again.  He explained that Northerners are foot soldiers who do what they are told while Norteños are higher ranking and make

decisions in the jails. Above Norteños are Nuestra Familia members. Someone higher up would have authorized his elevation from Northerner to Norteño, but he did not speak to anyone about it.

When he was arrested, Alvarez did not have any tattoos. Of the multiple tattoos he subsequently gained in custody, he described the following as gang related: "SK" on the back of his head for "[s]crap killer," "E" and "S" on his arms for "Eastside Modesto," "Modesto" on his chest, and "209" on his stomach. "N" is the 14th letter of the alphabet and the number 14 signifies Norteño. Alvarez had four dots on one hand and one dot on the other at one point, signifying 14, but he had those tattooed over. He denied needing permission to get gang tattoos and denied that having an "SK" tattoo meant he killed a Sureño. He testified that "[e]veryone gets that tattoo," and it just means disrespect toward Sureños.

Defendant had multiple tattoos at the time of arrest. In addition to collages of women's faces and his last name, defendant had a huelga bird against a red background on his arm, "209" on his stomach, "14" on the back of his head, "Modesto" across his upper back, "West Side Boyz" on his arm, "WS" on one shin, and "BZ" on the other shin. Alvarez testified that "WS" and "BZ" stood for West Side Boyz, "14" stood for Norteño, and the huelga bird was a common Nuestra Familia symbol.

Alvarez denied ever killing anyone or shooting at anyone. However, he admitted he had a 2007 felony assault conviction from a bar fight where he threw a bottle at a bouncer, cutting him; and he was present for three other fatal shootings. In 2007, he was with friends who opened fire at a house party, killing multiple people; in 2008, he was in a vehicle with someone who shot and killed multiple people; and in June 2009, the driver of a vehicle he was riding in shot and killed a gang dropout. Consistent with his testimony regarding the shooting in this case, Alvarez denied he participated in the other three shootings or knew they were going to occur in advance.

8.

Alvarez said the "[o]verall objective" as a gang member was to instill fear in rivals through fighting, tagging, and claiming territory, which showed dominance; and he described the gang lifestyle as never-ending rival combat. He testified that the shooting defendant committed benefitted their gang by letting the victims know "there's Norteños out there, and they can't just be chilling out there like that." Regarding his decision to tell authorities in 2018 that defendant committed the shooting and to testify, he stated, "If I was the one that did the murder, I would have taken the time and let him live his life, but he didn't do that, so that's only the right thing to do. The fact he never chose to do that for me, that's why I'm up here. I have to do what's best for my life like he's doing the best for his."

### D. Other Gang Evidence

Deputy Delgado and Detective Soria both testified as gang experts, with Delgado providing the majority of the gang evidence. Delgado testified that Norteños and Sureños are rival gangs. The Norteño gang predominates in Stanislaus County and includes the West Side Boyz. Norteños identify with the number 14 for "N," the huelga bird, and the color red; four dots on one hand and one dot on the other represent the number 14; and gang members use regional tattoos to represent where they are from and the territory they claim. Shown a photograph, Delgado opined that the "BZ" spray-painted on the street within the crime scene indicated a claim on that territory by the West Side Boyz, and he testified that claiming territory benefits the gang financially because they are then free to conduct their business there, such as selling drugs and committing robberies and burglaries. He also testified that the collective commission of gang crimes is a show of force intended to intimidate rivals and others, and that gangs gain status through fear and intimidation.

## II. Defense Case

Antonio S. testified he spent the day and evening drinking. He was cooking outside for family when a dark car with chromed wheels drove by slowly, with the front

passenger's side of the vehicle closest to his house. He did not see the gun, but heard what sounded like a machine gun and saw flashes coming from the backseat on the passenger side. He viewed a car in the police impound lot and identified it as the involved car. He denied he was a gang member and did not recall if there was someone at the barbecue with a three-dot hand tattoo.

Officer McQuery testified that Jose said he saw several vehicles pass by the house prior to the shooting and the involved vehicle had black, eight-spoke rims with a chrome stripe down the middle and did not have a sunroof. When Jose was asked to identify the black Charger driven by defendant, he said it was not the involved vehicle, as the wrecked Charger had different rims and a sunroof. Jose subsequently showed McQuery a magazine photo of the rims he saw on the involved car. However, Jose said the shots came from the driver's side window of a black Charger, he saw the muzzle of the gun and flashes of light, and the car slowed with headlights off before the shots were fired.

Regarding Antonio, McQuery testified his eyes were watery and red, and he appeared to be intoxicated. He was not willing to be interviewed at the sheriff's department.

Finally, Jesse De La Cruz, Ph.D., testified as a gang expert. Dr. De La Cruz had an extensive 55-year personal and professional history with gangs. He joined a criminal street gang at the age of 13 years, was personally involved in shootings and a stabbing, suffered multiple criminal convictions, served several decades in prison, and was a Nuestra Familia member for a few years in the 1970's. He left the gang at 27 years old, but continued with drug-related criminal activity until the age of 45. At that time, he turned his life around and pursued an education, culminating in his doctorate in educational leadership, with a dissertation on criminal street gangs.

Dr. De La Cruz disagreed with the prosecution's witnesses on a number of points. In his opinion, application of the gang statute was problematic because the statute did not identify a gang member and law enforcement did not know much about gangs. He

10.

testified that the huelga bird, the number 14, area codes, and regional tattoos do not have to do with gangs, although some gang members have adopted the number 14 and the huelga bird, the latter symbolizing Northern California and tracing back to Cesar Chavez.

Dr. De La Cruz also disagreed that gang members can get any tattoo they want and he stated that an individual would not get an "SK" tattoo without the gang's permission and that permission would be granted only if the individual had killed a scrap. In his opinion, Alvarez was not a street gang member, but he was a Norteño while in jail and, based on his "SK" tattoo and possession of wilas, was in the process of becoming a Norteño soldado. Wilas contain sensitive information, and Alvarez's possession of them demonstrated an elevated level of gang involvement and he would have faced discipline for being irresponsible with that information. However, that discipline would, perhaps, be in the form of a beating or being directed to write a lengthy essay; it would not be death. Nor would dropping out necessarily result in death. Dr. De La Cruz described the idea of death on sight for dropouts or rivals as "propaganda … by law enforcement," and said gang dropouts are generally killed only for transgressions such as hanging out on gang turf, selling drugs on gang turf, or denigrating their former gang.

Regarding hypothetical shootings mirroring the three Alvarez was present for prior to the crimes in this case, Dr. De La Cruz testified that someone present but claiming not to be involved might be given a pass the first time for not participating, but would be disciplined the second time and would not have been present a third time. He did not find a claimed lack of involvement in three separate hypothetical shootings credible. He agreed that shootings instill fear, but disagreed that instilling fear benefits gangs. However, he opined gang-related retaliation and intimidation benefit a gang, killing over colors benefits a gang, and shooting a rival gang member in front of other fellow gang members possibly benefits a gang.

**III.   Rebuttal and Surrebuttal**

On rebuttal, Deputy Delgado testified that Dr. De La Cruz's testimony did not change his mind that the shooting was gang related.  In his opinion, times have changed, and gangs are no longer regimented like they used to be.  Instead, there are a lot of prison politics, and gangs have devolved into disorder and disorganization.  However, he agreed that if a person was following the Nuestra Familia regimen, that person would need permission to get an "SK" tattoo.

In surrebuttal, Dr. De La Cruz said prison politics have been around forever and reiterated that approval is needed for an "SK" tattoo.

## DISCUSSION

**I.   Admission of Defendant's Prior Convictions as Predicate Offenses**

**A.   Background**

Under the version of the gang statute in effect at the time of trial, to prove a "'pattern of criminal gang activity'" within the meaning of the statute, the prosecutor was required to introduce evidence of "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more [specifically enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons…."  (§ 186.22, former subd. (e).)  One of the qualifying offenses is "[a]ssault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in Section 245."  (§ 186.22, subd. (e)(1)(A), formerly subd. (e)(1).)  Through the testimony of two law enforcement witnesses, the prosecutor introduced evidence of two assault convictions suffered by defendant under section 245, assault with a firearm committed on August 30, 2001, and assault with a deadly weapon committed on June 11, 2004.  Certified records of the convictions were admitted by the trial court.

During Sergeant Vierra's testimony, the prosecutor questioned him regarding a 2001 shooting in which defendant was a suspect and then, over defendant's objection, moved a certified copy of the conviction into evidence. Outside the presence of the jury, the prosecutor stated the assault conviction was admissible as a predicate offense. Defendant objected to admission of his conviction for the 2001 assault and the anticipated admission of his second conviction for the 2004 assault. He argued that the prosecutor could prove predicate offenses using evidence of crimes committed by other people, and that admission of his prior assault convictions was highly prejudicial character evidence under Evidence Code section 1101 and should be excluded under Evidence Code section 352.

On appeal, defendant claims the trial court's failure to exclude the evidence of his prior assault convictions under Evidence Code section 352 was an abuse of discretion, and the error was prejudicial. Defendant concedes that prior crimes evidence is relevant to proving the gang enhancement, but the prosecutor could have relied on crimes committed by individuals other than defendant, including Alvarez. We conclude that it was not error to admit evidence of defendant's two assault convictions.[5]

## B.     Legal Principles

Under California law, evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210), and all relevant evidence is admissible except as otherwise

---

[5]     Prior to trial, the prosecutor filed a motion in limine requesting admission of defendant's prior convictions for impeachment, should he testify. Defendant opposed the motion, but requested that if the convictions were admitted for impeachment, they be sanitized. The court reserved the issue for evaluation depending on the evidence adduced during trial. Defendant did not testify and when he later objected to admission of the convictions as predicate offenses, he did not object to the form of the certified records and did not seek either a stipulation or a redaction of irrelevant information. Therefore, to the extent the records contained objectionable information, that issue was not preserved for review. (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 434–435.)

provided by statute (Evid. Code, § 351). At issue here, Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

However, "'"[p]rejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption "'substantially outweigh'" the probative value of relevant evidence, a section 352 objection should fail. [Citation.] "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" [Citation.] [¶] The prejudice that section 352 "'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'" (*People v. Doolin* (2009) 45 Cal.4th 390, 438–439; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105; *People v. Tran* (2011) 51 Cal.4th 1040, 1048 (*Tran*).)

14.

On appeal, we presume the trial court's evidentiary ruling is correct and defendant bears the burden of demonstrating error.  (*People v. Giordano* (2007) 42 Cal.4th 644, 666; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139–1140.)  "The trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence.  [Citation.]  'The exercise of discretion is not grounds for reversal unless "'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'""'"  (*People v. Clark* (2016) 63 Cal.4th 522, 572; accord, *People v. Johnson* (2019) 8 Cal.5th 475, 521.)

C.    Analysis

In *Tran*, the California Supreme Court held that "a predicate offense [may] be established by proof of an offense the defendant committed on a separate occasion," and it rejected the argument, advanced here, that "the inherent prejudice in such evidence generally requires its exclusion under Evidence Code section 352 .…"  (*Tran, supra*, 51 Cal.4th at p. 1046.)  "The prejudicial effect of evidence defendant committed a separate offense may, of course, outweigh its probative value if it is merely cumulative regarding an issue not reasonably subject to dispute.  [Citations.]  But the prosecution cannot be compelled to "'present its case in the sanitized fashion suggested by the defense.'"  [Citation.]  When the evidence has probative value, and the potential for prejudice resulting from its admission is within tolerable limits, it is not *unduly* prejudicial and its admission is not an abuse of discretion.  Further, a rule requiring exclusion of evidence of a defendant's separate offense on the theory the prosecution might be able to produce evidence of offenses committed by other gang members would unreasonably favor defendants belonging to large gangs with a substantial history of criminality.  That the prosecution might be able to develop evidence of predicate offenses committed by other

15.

gang members therefore does not require exclusion of evidence of a defendant's own separate offense to show a pattern of criminal gang activity." (*Id.* at p. 1049, fn. omitted.)

Defendant attempts to distinguish *Tran* on the ground that it approved admission of the evidence in a case where the defendant was charged and convicted with a substantive gang offense under section 186.22, subdivision (a). (*Tran, supra*, 51 Cal.4th at p. 1046.) However, the charges in *Tran* also included gang enhancement allegations and the court's reasoning applies with equal force to gang enhancements alone. (*Ibid.*)

In *Tran*, the court explained that unlike the admission of evidence under Evidence Code section 1101, subdivision (b), where "the evidence is probative because of its tendency to establish an *intermediary fact* from which the ultimate fact of guilt of a charged crime may be inferred" (*Tran, supra*, 51 Cal.4th at p. 1048), "the probative value of evidence of a defendant's gang-related separate offense generally is greater because it provides direct proof of several *ultimate facts* necessary to a conviction" (*ibid.*). Where charged, a gang enhancement requires proof the defendant committed the underlying felony "for the benefit of, at the direction of, or in association with a criminal street gang …." (§ 186.22, subd. (b)(1).) Proving the existence of a criminal street gang requires, in turn, proof of a pattern of criminal activity, which is satisfied by evidence of at least two qualifying predicate offenses. (§ 186.22, subds. (e)(1), (f).) Because evidence of defendant's two prior assault convictions was admitted to directly establish an element of the gang enhancement, the evidence was less inherently prejudicial than "when [if] admitted to establish an intermediary fact from which guilt may be inferred." (*Tran, supra*, at p. 1048.)

At bottom, defendant's argument is that because the prosecutor could have relied on other evidence to satisfy the predicate offense element, he should have been required to do so. This argument is foreclosed under *Tran*. Furthermore, the factors identified in *Ewoldt* as relevant to an inquiry of prejudice did not weigh against admission: the evidence emanated from a source independent of the charged offense, the prior acts

resulted in conviction, and the evidence of the prior acts was "no stronger or more inflammatory than the testimony concerning the charged offense[s]" of murder and attempted murder. (*Tran, supra*, 51 Cal.4th at p. 1047, citing *People v. Ewoldt* (1994) 7 Cal.4th 380, 404–405.) Additionally, this is not a case where admission of the evidence was cumulative or otherwise gratuitous. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 610 [prosecutors do not have the "right to 'over-prove their case or put on all the evidence that they have'"].) The prosecutor was required to prove at least two qualifying predicate offenses and although not required to do so under the law, he nevertheless limited the evidence of predicate offenses to two. (See *People v. Hill* (2011) 191 Cal.App.4th 1104, 1139 [no abuse of discretion in admitting evidence of eight predicate offenses].) Accordingly, the trial court did not abuse its discretion in admitting the evidence of defendant's prior convictions, and it is unnecessary to consider defendant's argument of prejudice.

## II.     Substantial Evidence Claim

Next, defendant claims his convictions for attempted murder are not supported by substantial evidence of intent to kill. We also conclude this claim lacks merit.

### A.     Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable,

17.

credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Zamudio, supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ….'" (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Zamudio, supra*, at p. 357.)

### B.    Attempted Premeditated Murder

"An attempt to commit a crime consists of two elements:  a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) While murder is an unlawful killing with express or implied malice aforethought (§§ 187, subd. (a), 188; accord, *People v. Rangel* (2016) 62 Cal.4th 1192, 1220), attempted murder requires specific intent to kill, or express malice, "'and the commission of a direct but ineffectual act toward accomplishing the intended killing'" (*People v. Smith* (2005) 37 Cal.4th 733, 739; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 653–654).  Express malice is shown when the defendant "'either desires the victim's death, or knows to a substantial certainty that the victim's death will occur.'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1217; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

"For an attempt, the overt act must go beyond mere preparation and show that the killer is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime [citation]." (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8; accord, *People v. Garton* (2018) 4 Cal.5th 485, 514.)  "[E]vidence of motive is often probative of intent to kill[,]" but it "is not required to establish intent to kill[.]" (*People v.*

18.

*Smith, supra*, 37 Cal.4th at p. 741.) Intent "may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Ibid.*)

Unlike murder, "attempted murder is not divided into degrees, but the sentence can be enhanced if the attempt to kill was committed with premeditation and deliberation." (*People v. Gonzalez, supra*, 54 Cal.4th at p. 654.) More than a specific intent to kill is required to support a finding of deliberation and premeditation. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*Ibid.*) "'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly…." [Citations.]'" (*Ibid.*)

### C.     Analysis

Defendant's challenge to his attempted murder convictions is limited to intent to kill. He asserts that the jury was not instructed on a concurrent intent or kill zone theory, and there is no evidence he intended to kill either named victim, entitling him to reversal. However, as discussed herein, the prosecutor was not required to—and did not—rely on a concurrent intent, or kill zone, theory, and this is not one of those "relatively few cases" where it would have applied. (*People v. Canizales* (2019) 7 Cal.5th 591, 608 (*Canizales*); accord, *In re Sambrano* (June 9, 2022, E078147) ___ Cal.App.5th ___, ___ [2022 Cal.App. Lexis 505, *13] (*Sambrano*).) Instead, defendant's action in firing multiple rounds into a crowd of people at close range supplied substantial evidence of intent to kill. That he did not know any of the victims and was not targeting a particular person does not undermine the convictions.

Under a concurrent intent theory, or a kill zone theory, "'"[w]here the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all

who are in the anticipated zone.""" (*Canizales, supra*, 7 Cal.5th at pp. 602–603, quoting *People v. Bland* (2002) 28 Cal.4th 313, 330 (*Bland*).) No small amount of confusion ensued after the decision in *Bland*, and in *Canizales*, the California Supreme Court clarified that "the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales, supra*, 7 Cal.5th at p. 607.)

Recently, the Court of Appeal in *Sambrano* clearly and succinctly summarized the relevant principles, as follows:

> "If there is no evidence of a primary target, then the kill zone theory does not apply. (*Canizales, supra*, 7 Cal.5th at p. 608 ['evidence of a primary target is required'].)

> "Relatedly, if the evidence shows only that the defendant intended to kill everyone in a particular area, but not *as a means of ensuring the death of a primary target*, then the kill zone theory does not apply. (*Canizales, supra*, 7 Cal.5th at p. 607 [a kill zone is 'an area in which the defendant intended to kill everyone present to ensure the primary target's death'].)

> "If there is evidence of a primary target, but the evidence shows only that the defendant subjected people near the primary target to lethal risk, or that the defendant acted with conscious disregard of the risk of serious injury or death for people near the primary target, then the kill zone theory does not apply. (*Canizales, supra*, 7 Cal.5th at p. 607.)

20.

"Jury instructions on the kill zone theory are *never* required. (*People v. Stone* (2009) 46 Cal.4th 131, 137–138 (*Stone*); *People v. Smith* (2005) 37 Cal.4th 733, 746 (*Smith*); *People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6 (*Bland*).)" (*Sambrano, supra*, ___ Cal.App.5th at p. ___ [2022 Cal. App. Lexis 505, *1–2].)

The kill zone theory clearly does not apply to the facts of this case. Rather, defendant's intent to kill multiple people is readily inferable from his actions.

"[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive, although again, where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill." (*People v. Smith, supra*, 37 Cal.4th at p. 742; accord, *People v. Foster* (2021) 61 Cal.App.5th 430, 440.) Further, "[a] person who acts with intent to kill in firing at a group of people is 'guilty of attempted murder even if he or she intended to kill a random person rather than a specific one.'" (*People v. Foster, supra*, at p. 440, quoting *People v. Stone, supra*, 46 Cal.4th at p. 141.)

The evidence showed that defendant, after hearing there were some rival Sureño gang members on a nearby street, drove down that street and, from approximately 16 feet away, fired 13 rounds from an automatic firearm at the crowd in the front yard, killing one person and wounding two. This action was more than sufficient to support the jury's findings that defendant acted with intent to kill when he shot at a group and wounded the two attempted murder victims. (*People v. Foster, supra*, 61 Cal.App.5th at pp. 443–444; accord, *In re Lisea* (2022) 73 Cal.App.5th 1041, 1057–1058; *People v. Medina* (2019) 33 Cal.App.5th 146, 153–154.)

21.

### III. Assembly Bill 333

Finally, in supplemental briefing, defendant seeks relief under Assembly Bill 333, which amended section 186.22, effective January 1, 2022.[6] The parties agree that the amendment to section 186.22 applies retroactively to cases not yet final, and that defendant is entitled to have the gang enhancement findings vacated because they are not supported by sufficient evidence under the amended version of section 186.22. We agree with the parties on both points.

This court has concluded that Assembly Bill 333's amendment of section 186.22 is ameliorative in nature and, therefore, applies retroactively to nonfinal cases such as this one, in accordance with *In re Estrada* (1965) 63 Cal.2d 740. (*People v. Ramos, supra*, 77 Cal.App.5th at pp. 1126–1127; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822; see *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032, fn. 9.) Therefore, defendant is entitled to benefit from the amendment of section 186.22 under Assembly Bill 333.

As recently summarized by this court in *Ramos*, "Assembly Bill 333 amended the definition of a "'criminal street gang,'" requiring proof that the gang is an *organized* association, whose members *collectively* engage in, or have engaged in, a pattern of criminal activity (§ 186.22, subd. (f)). Next, the law created a stricter requirement for proof of a 'pattern of criminal gang activity,' which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. (§ 186.22, subd. (e).) Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate

---

[6] Assembly Bill 333 also added section 1109 to the Penal Code, which addresses the bifurcation of both substantive gang offenses and gang enhancements under section 186.22, but that amendment is not at issue in this appeal. (See *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1119, 1126, 1131–1133 & fn. 7 (*Ramos*) [concluding § 1109 also applies retroactively, but the error was not prejudicial under *People v. Watson* (1956) 46 Cal.2d 818, 836]; but see *People v. Burgos* (2022) 77 Cal.App.5th 550, 554, 568–569 [§ 1109 applies retroactively and assuming harmless error analysis applies, error prejudicial under either federal or state standard of review].)

occasions within three years of one another.  (See former § 186.22, subd. (e).)  Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses.  (§ 186.22, subd. (e)(2).)  In addition, the last of the predicate offenses must have 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed.'  The predicate offenses must have been committed by gang 'members,' and must have been for the 'common[] benefit[] [of] a criminal street gang.'  (§ 186.22, subd. (e)(1).)  Assembly Bill 333 also narrowed the list of offenses that may be used to establish a pattern of criminal gang activity (compare former § 186.22, subd. (e)(1)–(33) with § 186.22, subd. (e)(1)(A)–(Z)).  Additionally, it defines 'to benefit, promote, further, or assist' throughout section 186.22 to mean 'to provide a common benefit to members of a gang where the common benefit is more than reputational.'  (§ 186.22, subd. (g).)  The legislation notes examples of a common benefit that are more than reputational 'may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.'  (*Ibid.*)"  (*Ramos, supra*, 77 Cal.App.5th at pp. 1125–1126.)

As is common in gang cases, the prosecutor proceeded on the theory that the charged crimes provided a reputational benefit to the Norteño gang by causing fear and intimidation, and there was no testimony identifying any benefit that extended beyond bolstering the gang's reputation.  Under the gang statute as amended, this evidence is insufficient to support a finding that defendant committed murder and attempted murder "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members …."  (§ 186.22, subd. (b)(1).)

In addition,  the evidence introduced to show a pattern of criminal activity within the meaning of the statute also falls short under the statute as amended.  (§ 186.22,

subds. (e)(1), (f).)  Specifically, the two predicate offenses occurred within three years of one another, but the second offense did not occur within three years of the charged offenses, and the prosecutor did not offer any evidence that the predicate offenses benefitted the gang and the benefit was more than reputational.  (*Id.*, subd. (e)(1).)

Moreover, defendant points out that the charged offenses may no longer be considered to satisfy the definition of a pattern of criminal gang activity.  The jury was instructed, in part, "If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of those primary activities was the commission of that crime and whether its pattern of criminal gang activity has been proved."  However, the jury was also instructed, more specifically based on the facts of this case, that a criminal street gang within the meaning of the gang enhancement means a group "that has as one or more primary activities, the com[m]ission of assault with a deadly weapon and assault with force likely to produce great bodily injury," and a pattern of criminal gang activity means, in relevant part, "the conviction of assault with a deadly weapon an[d] assault with force likely to produce great bodily injury .…"  Neither party emphasized the gang enhancements during closing argument or went over the elements for the jury, and the prosecutor noted only, in rebuttal, "So when you're talking about the gang enhancements you'll have the defendant's priors in here.  You see he's convicted on … another assault and in another three years that also goes towards the defendant's participation in a gang."

In this case, it appears unlikely that the jury relied on the charged offenses to find a "'pattern of criminal gang activity.'"  (§ 186.22, subd. (e)(1).)  Nevertheless, it is a possibility and, as defendant argues, it is no longer permissible to do so under the statute as amended.  (§ 186.22, subd. (e)(2).)  Given that the other evidentiary deficiencies are dispositive, we need not determine whether this error would, on its own, require reversal.  (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1090 [gang enhancements must be reversed where appellate court could not "conclude beyond a reasonable doubt that the

24.

jury imposed the gang enhancements on a now legally valid ground under Assembly Bill 333's amendments"], citing *People v. Aledamat* (2019) 8 Cal.5th 1, 13; accord, *People v. Hola* (2022) 77 Cal.App.5th 362, 376, fn. 14.)

In light of the foregoing, defendant is entitled to have the gang enhancement findings attached to counts I through III vacated, and we shall remand the matter to the trial court for further proceedings. On remand, the prosecution may elect to retry defendant on the gang enhancements under section 186.22 as amended by Assembly Bill 333.[7] (*Ramos, supra*, 77 Cal.App.5th at p. 1128; accord, *People v. Rodriguez, supra*, 75 Cal.App.5th at p. 824; *People v. Vasquez, supra*, 74 Cal.App.5th at p. 033.)

## DISPOSITION

The gang enhancement findings attached to counts I through III are vacated, and this matter is remanded to the trial court. If the prosecution does not elect to retry defendant on the gang enhancements within 60 days from the filing of the remittitur in the trial court, the trial court shall resentence defendant and forward an amended abstract of judgment to the appropriate authorities. Except as modified, the judgment is affirmed.

MEEHAN, J.

WE CONCUR:


PEÑA, Acting P. J.



DeSANTOS, J.

---

[7] Where reversal is not "'"based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial."'" (*Ramos, supra*, 77 Cal. App.5th at p. 1128, quoting *People v. Sek, supra*, 74 Cal.App.5th at p. 669.)